IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN GEORGE | : | |
|     Plaintiff | : | Civil Action No. 1:06-cv-01554 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| WARDEN THOMAS HOGAN et al., | : | |
|     Defendants | : | |

## MEMORANDUM

Before the Court are the report and recommendation of Magistrate Judge Andrew Smyser (Doc. No. 31) recommending that the Court deny Defendants' motion for summary judgment (Doc. No. 25) and Defendants' objections thereto (Doc. No. 32). For the reasons that follow, the Court will, independent of Defendants' objections, reject the report and recommendation, overrule Defendants' objections, and grant Defendants' motion for summary judgment.[1]

### I.   BACKGROUND

#### A.   Procedural History

On August 10, 2006, Plaintiff Kevin George, a United States Immigrations and Customs Enforcement ("ICE") detainee at York County Prison ("YCP") in York, Pennsylvania, filed a pro se complaint against Defendants Thomas Hogan, warden of York County Prison, and Steven Chronister, a York County Commissioner and president of the York County Prison Board, alleging that the conditions of his detention violated his federally protected rights. (Doc. No. 1, at 4.) Plaintiff filed an amended complaint on October 30, 2006. (Doc. No. 11.)

---

[1] The Court's use of the term "rejects" in this context is consistent with the language of 28 U.S.C.A. § 636, which provides in relevant part: "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C.A. § 636(b)(1).

Defendants filed the instant motion for summary judgment (Doc. No. 25), a supporting brief (Doc. No. 26), and a statement of facts (Doc. No. 27) on July 10, 2007. Plaintiff filed a brief in opposition soon thereafter. (Doc. No. 29.) On August 20, 2007, Magistrate Judge Andrew Smyser issued a report and recommendation recommending that the Court deny Defendants' motion for summary judgment (Doc. No. 32) and Defendants subsequently filed objections thereto (Doc. No. 33).

Defendants' motion for summary judgment rests in principal part upon the assertion that Plaintiff did not exhaust the prison's administrative grievance procedure before filing suit as required by the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996). (Doc. No. 31, at 5.) Plaintiff counters that, as an ICE detainee, he was not a "prisoner" as defined in § 1997e(h), and therefore not required to exhaust the prison's administrative grievance procedure before filing the instant complaint. Magistrate Judge Smyser reasoned:

> It is a material undisputed fact that the plaintiff's incarceration was as "a federal prisoner being held by the immigration service." . . . As an ICE detainee, the plaintiff was not a "prisoner" as defined in 42 U.S.C. § 1997e(h). Even though he was charged in Philadelphia at the time with a criminal violation, and was later convicted, it is not in dispute that his York County custody was as an ICE detainee. His York County custody was not based upon the Philadelphia charge or the Philadelphia conviction. Therefore, since the exhaustion requirement under 42 U.S.C. § 1997e is not applicable to one who is not a "prisoner" as defined for purposes of that statute, the defendants are not entitled to summary judgment on the basis that the plaintiff did not exhaust administrative remedies.

(Id., at 5-6 (citations omitted).)

Conceding Plaintiff's status as an ICE detainee, Defendants object to the Magistrate Judge's "fail[ure] to recognize the status of Plaintiff as a state prisoner in the YCP in pre-trial confinement when the incidents in the alleged complaint occurred on March 2 and June 15, 2006." (Id., at 2.)  Defendants contend that Plaintiff, who was convicted of trademark counterfeiting and copying recording devices in violation of the Commonwealth of Pennsylvania Crimes Code, was being detained in YCP for violations of both federal immigration law and the laws of the Commonwealth.  (Id.)  Defendants ask this Court to either sustain their objections or enter an order under the provisions of Federal Rule of Appellate Procedure 5(a)(3) granting them permission to appeal the question of the PLRA's applicability to the instant claim.  (Id., at 3.)

**B.     Facts**

On February 22, 2005, the Philadelphia Police arrested Plaintiff on charges of trademark counterfeiting and copying recording in violation of the Commonwealth of Pennsylvania Crimes Code. (Doc. No. 24-2, at 21-22.)  Plaintiff posted bail the following day (Id., at 23) and was released into ICE custody (Doc. No. 29, at 5; see also Doc. No. 29-2, at 2).  Almost a year later, on January 5, 2006, Judge Abram Reynolds of the Court of Common Pleas of Philadelphia County formally arraigned Plaintiff on the aforementioned charges.  (Doc. No. 32-2, at 2.) Plaintiff was in ICE custody before and after his arraignment and, according to Joseph Sallemi, an ICE field director, "at the time the arraignment occurred."  (Id., at 2.)

On March 2, 2006, ICE transferred Plaintiff to YCP where, due to a "mass influx of aliens" (Doc. No. 11, at 3)—a fact which Defendants do not deny—he and several other detainees were allegedly made to sleep upon an elevated platform in the prison's pre-classification area  (Id., at 2).  That evening, Plaintiff alleges, he rolled from the platform

onto the concrete floor and "re-injured his lower back and left knee"—a "painful" and "unnecessary" mishap that "could have been avoided if Defendants had complied with the local, state, and federal laws for prisoners and detainees." (Id., at 3.) Sometime thereafter, Plaintiff was taken to Philadelphia for a bench trial before Judge Reynolds. (Doc. No. 24-2, at 27.) On May 5, 2006, Judge Reynolds found Plaintiff guilty of both charges and deferred sentencing to July. Plaintiff was subsequently re-committed to YCP (Doc. No. 32-2, at 3) where, according to the amended complaint, on June 15, 2006, Plaintiff and fifty-three other detainees were assigned to "cruel, unhealthy, and unusual" quarters in YCP's gym (Doc. No. 11, at 4-5).

Plaintiff was transferred pursuant to a state writ of *habeas corpus ad prosequendum* from YCP to Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia on June 29, 2006. (Doc. No. 24-2, at 21.) The following week Judge Reynolds sentenced Plaintiff to a total confinement of no less than eleven months and fifteen days and no more than twenty-three months. (Id., at 29; Doc. No. 32-2, at 3.) Plaintiff served his confinement in the custody of the Commonwealth at CFCF, filing the instant complaint from behind its walls. (Doc. No. 1, at 5; Doc. No. 29, at 8.) On March 6, 2007, after nearly eight months' confinement at CFCF, Plaintiff was paroled from CFCF into ICE custody and re-committed to YCP for detainment. (Doc. No. 24-2, at 32; Doc. No. 32, at 2; Doc. No. 41, at 4).

## II.    DISCUSSION

### A.    Applicability of the PLRA's Exhaustion Requirement

Plaintiff is subject to the PLRA's exhaustion requirement if he was "a prisoner confined in any jail, prison, or other correctional facility" when he brought his complaint against Defendants. 42 U.S.C. § 1997e(a). While no published opinion of the Third Circuit has

considered the definition of "prisoner" in the PLRA's exhaustion provision, 42 U.S.C. § 1997e(h), three other Courts of Appeals have considered the identically worded definition of "prisoner" in the PLRA's *in forma pauperis* provision, 28 U.S.C. § 1915(h), and all three of those courts concluded that an individual detained by the INS pending deportation is not a "prisoner."[2]  See Agyeman v. INS, 296 F.3d 871, 885-886 (9th Cir. 2002); LaFontant v. INS, 135 F.3d 158, 165 (D.C. Cir. 1998); Ojo v. INS, 106 F.3d 680, 682-83 (5th Cir. 1997).  As Judge Daniels of the District Court for the Southern District of New York observed:

> The list of reasons for confinement that § 1915(h) explicitly specifies as rendering someone a "prisoner" is extensive, but does not include detention pending deportation; "the absence of immigration regulations from the laundry list of other things one might violate [such as] parole, probation, and the like," implies that confinement for a violation of immigration regulations is not included within the § 1915(h) definition. "Had Congress wished to include immigration violations in this provision, it easily could have said so."

Gashi v. County of Westchester, No. 02-6934, 2005 WL 195517, at *5 (S.D.N.Y. Jan. 27, 2005) (citing Ojo, 106 F.3d at 682).  Swayed by the reasoning of Agyeman, LaFontant, and Ojo, Judge Daniels concluded that "when a plaintiff is detained under the [Immigration and Nationality Act] for deportation purposes, he becomes an 'alien detainee,' not a 'prisoner.'"  Id. (brackets omitted) (citing LaFontant, 135 F.3d at 165).

---

[2] The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, transferred the immigration enforcement functions of the Commissioner of Immigration and Naturalization ("INS") to the Secretary of Homeland Security.  Effective March 1, 2003, the INS's enforcement, detention, and removal functions were transferred to ICE, and INS ceased to exist.  Tavares v. Meyers, Civ. No. 04-00302, 2006 WL 1644776, at *1 n.3 (D.N.J. June 8, 2006).

Plaintiff alleges that his federally protected rights were violated at YCP on two dates, March 2, 2006, and June 15, 2006.  The record in this case clearly establishes that Plaintiff was an immigration detainee at YCP from March 2, 2006, to June 29, 2006, a period encompassing both of the alleged violations.  The record further establishes that ICE had exclusive custody of Plaintiff at all times during that period.  In fact, the Commonwealth relinquished custody of Plaintiff on February 23, 2006, when Plaintiff posted bail, and, but for his status as an illegal alien, Plaintiff would have been released on his own recognizance and not into ICE custody.  "The statutory language does not leave wriggle room; a convict out on parole is not a 'person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of . . . the terms and conditions of parole.'"  Kerr v. Puckett, 138 F.3d 321, 323 (7th Cir. 1998) (citing 42 U.S.C. § 1997e(h)).  Because an immigration detainee is not a prisoner for purposes of the PLRA, both Plaintiff and Magistrate Judge Smyser properly concluded that "[a]s an ICE detainee, the plaintiff was not a 'prisoner' as defined in 42 U.S.C. § 1997e(h)." (Doc. No. 31, at 6.)

Nevertheless, that conclusion misses the operative question in this and all such cases, which is not whether Plaintiff was a prisoner when the alleged violations *occurred*, but rather whether Plaintiff was a prisoner when the instant action was *brought*.  See 42 U.S.C. § 1997e(h) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.")  The fact that Plaintiff was not a 'prisoner' as defined in 42 U.S.C. § 1997e(h) when the acts complained of allegedly occurred is irrelevant.  "[I]t is the plaintiff's status at the time he files suit that determines whether

§ 1997e(a)'s exhaustion provision applies." Norton v. The City of Marietta, Oklahoma, 432 F.3d 1145, 1150 (10th Cir. 2005); see also Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002).

Aligning itself with "every court of appeals to have considered the issue," the Third Circuit held in Ahmed that "a prisoner who has been released is not precluded by the PLRA from filing a § 1983 suit for incidents concerning prison conditions which occurred prior to his release." Id. at 210. Moreover, the court hypothesized, the prisoner in Ahmed "would have been free of the strictures of the PLRA if he had filed a timely complaint after his release from prison." This rigid temporal distinction can, of course, create "a rather odd situation in which a person's ability to enforce his or her constitutional rights can be stripped upon incarceration, even where the rights to be enforced were infringed during that person's incarceration on an unrelated conviction." Gibson v. Brooks, 335 F. Supp. 2d 325, 330 (D. Conn. 2004). However, "a distinction between current and former prisoners makes a modicum of sense" given the PLRA's legislative history. Kerr, 138 F.3d at 323. As the Third Circuit and numerous other courts have observed, Congress had a two-fold purpose in enacting the PLRA. Ray v. Kertes, 285 F.3d 287, 294 (3d Cir. 2002). "First, Congress expressed a desire to lessen the burden frivolous prison claims placed on federal courts. Second, Congress wished to reinforce the power of prison administrators to control prison problems, minimizing the 'interference' of federal courts in matters of prison administration." Id. That an individual's "status as a prisoner bears directly on his ability to bring a lawsuit alleging a violation of constitutional rights is a result of congressional intention expressed in clear statutory language." Gibson, 335 F. Supp. 2d at 330. "These justifications simply do not apply to individuals who were formerly incarcerated." Greig v. Goord, 169 F.3d 165, 167 (2d Cir. 1999). Along those lines,

numerous courts have held that a plaintiff who was a prisoner at one facility when a § 1983 claim accrued but who brought the claim after being transferred to another facility is subject to the PLRA's exhaustion requirement. See, e.g., Medina-Claudio, 292 F.3d 31, 35 (1st Cir. 2002) ("The fact that [the plaintiff] happened to be a prisoner in various locations, and under the custody of different officials, does not affect his obligation to exhaust his administrative remedies before filing suit"); Santiago v. Meinsen, 89 F. Supp. 2d 435, 441 (S.D.N.Y. 2000) (holding that plaintiff should not "be rewarded for failing to participate in the grievance procedure by being permitted to bring a federal action without even attempting to resolve his claim administratively" even if "plaintiff's transfer from the facility in which the [alleged violation] occurred arguably made any grievance futile").

    Other courts have since extended the logic of cases such as Ahmed and Medina-Claudio to factual scenarios identical in all relevant respects to the one presented here and found that a plaintiff who was imprisoned at one facility when a § 1983 claim accrued but who was released and, by reason of criminal misconduct, brought the claim while imprisoned at another facility is likewise subject to the PLRA's exhaustion requirement. See Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003) (holding that a plaintiff who was incarcerated at one facility when actionable mistreatment occurred and brought suit while in custody at another facility after being released and arrested was subject to PLRA's exhaustion requirement); Gibson v. Brooks, 335 F. Supp.2d 325, 330 (D. Conn. 2004) (holding that individuals "who were incarcerated at the time that their claim accrued, were later released from prison, but did not file a lawsuit with respect to prison conditions until after they were again incarcerated" are subject to PLRA's exhaustion requirement). In light of the Third Circuit's holding in Ahmed and the foregoing decisions, the

Court finds that Plaintiff is subject to the PLRA's exhaustion requirement if he was "a prisoner confined in any jail, prison, or other correctional facility" on August 10, 2006, the date on which he brought the instant claim.

The undisputed facts in this case show that Plaintiff was a prisoner confined in CFCF from June 29, 2006, to March 6, 2007, having been, as Plaintiff attests in his brief in opposition, "found guilty of [a criminal] offense on July 6, 2006, after the dates of the incidents set forth in his claim, and . . . thereafter confined to serve a sentence of 8 months in [a] Philadelphia penal institution . . . and not York County Prison." (Doc. No. 29, at 7-8; see also Doc. No. 1, at 5; Doc. No. 24-2, at 29; Doc. No. 32-2, at 3). By his own admission, Plaintiff's circumstances as of August 10, 2006, fit squarely within the definition of "prisoner" found in § 1997e(h): He was an "incarcerated" person who had been "accused of, convicted of, sentenced for, or adjudicated delinquent for, violation of criminal law." 42 U.S.C. § 1997e(h). Plaintiff is therefore subject to the PLRA's exhaustion requirement.

### B. Exhaustion of Available Administrative Remedies

Failure to exhaust is an affirmative defense that must be pleaded and proven by the defendant. Ray, 285 F.3d at 295; see also Jones v. Bock, — U.S. —, 127 S. Ct. 910, 921 (2007) (concluding that "failure to exhaust is an affirmative defense under the PLRA"). The United States Supreme Court recently explained that exhaustion, as that term is used in the PLRA, is not "exhaustion *simpliciter*," but rather "exhaustion proper." Woodford v. Ngo, 548 U.S. 81, —, 126 S. Ct. 2378, 2382-83 (2006). In other words, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." Id., at 2384. Inasmuch as prisoners must exhaust "all

9

'available' remedies," including those that provide only non-monetary relief or fall short of federal standards, this precondition is absolute. Id., at 2382-2383.

In a civil rights action such as the one at hand, the PLRA's exhaustion requirement includes not only a technical component but a procedural component whereby "a prisoner must properly (i.e., on pain of procedural default) exhaust administrative remedies as a prerequisite to a suit in federal court." Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004). When considering the technical component, the operative question is "whether [a prisoner] has exhausted his administrative remedies in the literal sense" or "whether further avenues of relief are available to him." Id. at 232. Whether or not such avenues are available is generally a matter of record requiring little elaboration. See, e.g., id. ("Spruill's grievances went through all stages and were denied. He has no further administrative process available.").

The "determination whether a prisoner has 'properly' exhausted a claim [for procedural] purposes," on the other hand, "is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials." Id. at 222. Thus, the "yardstick for measuring procedural default" is a particular prison's grievance procedure, not express or common federal law. Id. at 231. Although the PLRA's exhaustion requirement "completely precludes a futility exception," the understanding in the Third Circuit is that "compliance with the administrative remedy scheme will be satisfactory if it is substantial." Nyhuis v. Reno, 204 F.3d 65, 77 (3d Cir. 2000); see also Spruill, 372 F.3d at 231 n.10 ("We are comfortable that evaluating a procedural default in the course of an existing and fully developed grievance will be an order of magnitude less complex

and less fact-intensive than ascertaining whether a prisoner's undeveloped grievance would be futile.").

YCP's grievance procedures, collectively known as the Complaint Review System ("CRS"), are fully explained in the Handbook for Inmates and the official complaint form, both of which were provided to Plaintiff on several occasions.  (Doc. No. 27, at 4; Doc. No. 27-3, at 7.)  The CRS requires that prisoners direct their complaints in writing to the designated Complaint Supervisor.  (Doc. No. 27-3, at 8-9, 17.)  The following deadlines apply:

> Grievance complaints should be filed within ten (10) days of the act, acts or omission or conditions that form the basis of the complaint.  In no even will any grievance be considered after six (6) months unless for cause shown establishing that the inmate was physically or mentally unable to file a grievance.  No grievance will be considered more than one (1) year after the act, acts or omissions or conditions that form the basis of the complaint.

(Id., at 19.)  Absent extenuating circumstances, the Complaint Supervisor must deliver "a written report containing a written summary of the facts as they appear to him, what steps or measures he has taken, the results he has achieved, the conclusions he has formed, and his recommendations . . . to the Deputy Warden for Treatment, with copies to the Complainant and all staff members mentioned in the complaint, no later than ten (10) working days after receipt of the complaint."  (Id., at 10 (emphasis omitted); see also id., at 19.)  Should a prisoner be dissatisfied with the Complaint Supervisor's response, the CRS provides three levels of appeal: first to the Deputy Warden, then to the County Solicitor, and, finally, to the York County Prison Board.  (Id., at 10-12; see also id., at 19.)

It is an undisputed fact that Plaintiff failed to exhaust or even avail himself of YCP's grievance procedure.  (Doc. No. 27, at 2 (citing the affidavits of Defendants and Complaint

Supervisor Roger Thomas.))  Prior to bringing the instant action, Plaintiff made no attempt to notify Defendants or prison personnel of the matters of which he now complains (id.), despite the fact that he "was aware of the administrative procedures that were available to him at the York County Prison and [had] filed grievances on unrelated matters" (Doc. No. 27-3, at 2).  Moreover, even if Plaintiff were to establish that he had been "physically or mentally unable to file a grievance" and thereby entitled to an extension, the one-year deadline for filing a complaint under the CRS has long since passed.  (Id., at 19.)  The record in this case conclusively demonstrates that Plaintiff did not exhaust "his administrative remedies in the literal sense." Spruill, 372 F.3d at 223.

Turning to the procedural component, the Court initially notes that the CRS anticipates the filing of complaints by prisoners and non-prisoners alike, including those imprisoned at another facility.  According to the Inmate Handbook, prisoners "may submit [a complaint] via a block officer, a supervisor, a counselor, a family member or the mail," while prisoners "who are transferred to another institution or released from the York County Prison may file grievance [sic] in writing by addressing a letter to the Deputy Warden of Treatment, York County Prison, 3400 Concord Road, York, Pennsylvania."  (Doc. No. 27-3, at 19.)  Appeals are taken "by writing a letter which explains the reason or reasons for appeal to the Chairman" of the York County Prison Board.  (Id.; see also id., at 15.)  Finally, both the CRS Regulations and the Inmate Handbook warn that "the grievance system shall not be considered exhausted unless all reviews and appeals have been taken on time and denied."  (Id., at 19.)

In his brief in opposition, Plaintiff argues that "[e]ven if the PLRA's exhaustion requirement did applied [sic] in this particular matter, several written complaints by Plaintiff to

cure the accident he sustained as a result of Defendants' [acts] prove [sic] futile and failed to yield any equitable outcome." The written complaints to which Plaintiff refers were in fact four medical request forms submitted to staff members at YCP's medical department in May and June 2006. However, only two of the forms were completed and signed by staff members, and neither of them make note of the alleged violations. In his June 15, 2006, request form, Plaintiff stated: "The cot bunk I currently sleep on with no mattress hurts my pre-existing back injury and my left knee. I need to be placed in normal flat bunk [sic] with double mattress to minimize the pain. I also need treatment for the pains [sic]." (Doc. No. 29-2, at 5.) Twelve days later, Plaintiff made an almost identical request: "I am currently made to sleep at a top bunk bed which is very difficult and painful for me to climb up and down due to my left knee and back injury I sustained here. To avoid being re-injured yet again, I need a bottom bunk space [and] ASAP." (Id., at 7.) A staff member responded to Plaintiff's requests the very next day, prescribing Naprosyn and placing an order for a lower bunk. (Id.)

Using the CRS as the "yardstick for measuring procedural default," Spruill, 372 F.3d at 231, it is plain to see that Plaintiffs belated efforts fall far short of the mark. Submitting two medical request forms to medical department staff members does not represent "substantial" compliance with YCP's grievance procedures. Nyhuis, 204 F.3d at 77. The CRS was available to Plaintiff throughout his confinement in Philadelphia. Nevertheless, Plaintiff elected to bring a claim in this Court instead of filing a complaint with YKP. See e.g., Medina-Claudio, 292 F.3d at 35 (finding that the plaintiff failed to satisfy PLRA's exhaustion requirement where "[n]othing in the regulations explicitly prevent[ed him] from filing an administrative complaint while temporarily housed at another facility"); compare Mitchell v. Horn, 318 F.3d 523, at 529 (3d Cir.

2003) (finding reversible error where the district court failed to consider plaintiff's allegations that he had been denied the necessary grievance forms and as a result lacked available administrative remedies). Plaintiff "procedurally defaulted" by any reasonable measure and therefore failed to satisfy the PLRA's exhaustion requirement. Accordingly, the Court will grant Defendants' motion for summary judgement. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN GEORGE | : | |
| | : | |
| Plaintiff | : | Civil Action No. 1:06-cv-01554 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| WARDEN THOMAS HOGAN et al., | : | |
| | : | |
| Defendants | : | |

## ORDER

**AND NOW**, on this 31st day of March 2008, upon due consideration of the report and recommendation of Magistrate Judge Smyser (Doc. No. 31) and Defendants' objections thereto (Doc. No. 32), and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT**:

1. Defendants' objections to the report and recommendation (Doc. No. 32) are **OVERRULED**.

2. Magistrate Judge Smyser's report and recommendation (Doc. No. 31) is **REJECTED**.

3. Defendants' motion for summary judgment (Doc. No. 25) is **GRANTED**.

4. The Clerk of Court is directed to **ENTER** judgment in favor of Defendants and against Plaintiff.

5. The Clerk of Court is directed to **CLOSE** this case.

s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania